HUDSON *v*. THE GEORGIA PACIFIC RAILWAY COMPANY.

1. Whether or not a train flagman who was injured while giving signals to the engineer, was in the line of his duty or was assuming to act for the conductor, and whether or not he was guilty of contributory negligence, were questions for the jury.
2. Whether or not the plaintiff was an expert, his opinion as to the propriety of his own conduct on the occasion of the injury, was not admissible testimony.
3. A motion for a new trial after the award of a nonsuit is not the proper practice. A motion to reinstate the case should be made, or a bill of exceptions to this court taken.

April 11, 1890.

Nonsuit. Railroads. Negligence. Master and servant. Evidence. Practice. Before Judge VAN EPPS. City court of Atlanta. December term, 1889.

Hudson sued for damages. On the trial the testimony offered by him tended to show the following: On June 2, 1888, he was working for 'the railway company as flagman, and had been so working about four months. He left Atlanta on the evening before, on a train of defendant bound for Birmingham. His place on that train, while it was in motion, was in the cab, the doors of which were just like the doors of a box-car. The usual and customary way of giving information to the engineer as a train approached a station, as to whether he should stop or not, was by signalling from the cab. The conductor would give the signals when he could see the engine from his side of the cab, which was the right hand side, and when he could not see the engineer from his side then it was the plaintiff's duty to give them. At the place where the injury was inflicted, on account of a curve in the track, the conductor could not see the engineer from the right hand side, but plaintiff could signal to the engine from the left hand side. Plaintiff knew that the train was not to stop at the station it was approaching. More than one time

before, when he could see the engineer or the fireman
from his side of the cab, and the conductor could not
see them from his side, the conductor had told him to
give the signal. He did not tell the plaintiff at the
particular time in question to signal the engineer to go
ahead, but the plaintiff knew he was to give the signal.
It was his usual way of ascertaining whether the train
was to stop at a station to look over the way-bills, and
this was done with the knowledge and approval of the
conductor. He so ascertained on this occasion. There
was no rule to compel him to be on one side and the
conductor on the other, so far as the plaintiff knew
unless the conductor ordered him to be there. It was
the practice on that train for the conductor to order
plaintiff to give signals, and for the engineer, just be-
fore he arrived at a station, to blow a station-signal, and
for a response to that signal to be given from the cab,
so that he might know whether he should pass the sta-
tion without stopping, and the person giving the signal
from the cab could find out whether the engineer saw it
by a reply from the whistle by the engineer. There
was no other way to find out except that. At the time
in question the train was approaching a station where
plaintiff knew it was not to stop, and the engineer gave
the station-signal. Plaintiff went to the door with his
lantern in his left hand, holding on to the door or door-
facing with his right, and gave the engineer with the
lantern the "go ahead signal" several times. In doing
this he leaned out of the car, so far as was necessary to
give the signal properly. The engineer, without giving
a return-signal to indicate that he had seen plaintiff's
signal, started forward (the train having been slackened
up), giving the train a severe and unusual jerk, which
threw plaintiff out of the door and inflicted upon him
severe injuries, the train being at the time on a trestle.
It was customary for the train to slack up speed in go-

ing upon the trestle, and the engine was always thrown open there to pull up after crossing the trestle. At the time the jerk was given the engine was somewhere near the end of the trestle, but was not off of it. At that part of the road, after coming down to the trestle and taking up the slack of the train, sometimes there was a jerk and sometimes there was not; but this jerk was severe and unusual. It jerked another brakesman, who was in the cab looking out of the window, up against the facing of the window; and he supposed if he had been standing in the door, like plaintiff was, it would have jerked him out. This was the first time this brakesman ever noticed the engineer jerking that hard before. There were no iron things about this door provided for plaintiff to hold by, though some of the cabs have such arrangements. Plaintiff had never complained to the conductor, nor to anybody, about there being no hold there, but had complained about there not being a bar or chain across the door to keep any one from falling out. All cabs did not have such a bar or chain, and plaintiff had never seen any rule to that effect. There was evidence as to his age, earnings, extent of his injuries, etc.

During the course of his examination he was asked, "What was the practice as to giving information, and how was it proper to give information to the engineer, as you approached a station, as to whether he should stop or not stop?" Defendant's counsel objected to the question on the ground that it was not the proper way to show it, and this objection the court sustained, holding that what was the usual and customary way of giving signals could be shown, but that the opinion of the witness as to what was proper was not competent. At the conclusion of the testimony the court granted a nonsuit, on the grounds that it did not affirmatively appear that the plaintiff was in the line of his duty in giving the signal,

but he was assuming to act in the capacity of conductor in saying that the train should stop or should not stop at the station, and not acting upon the express orders of the conductor to signal the train to go forward; and that the plaintiff was guilty of contributory negligence; and that the jerk of a freight-train, such as that mentioned in the evidence, was a peril incident to the service. The defendant moved for a new trial on the grounds that the court erred in sustaining the objection to the question asked plaintiff as above stated, and in granting the nonsuit. The motion was overruled, and the plaintiff excepted.

HOKE & BURTON SMITH, for plaintiff.

JACKSON & JACKSON, for defendant.

SIMMONS, Justice.

1. The facts of this case will be found in the official report. Under those facts, we think the court erred in awarding a nonsuit. We think the court should have submitted to the jury the question whether the plaintiff was acting in the line of his duty in giving the signal to the engineer, or whether he was assuming to act in the capacity of conductor in giving the signal without being specially directed to do so at that time by the conductor, the testimony showing that he had orders from the conductor on several other occasions to give the signal when it could be done from his side of the cab, and could not be done from the conductor's side. The court should also have submitted to the jury whether the plaintiff was guilty of contributory negligence or not. These are questions of fact for the jury to pass upon, and not for the court. If the evidence had shown only that the plaintiff was thrown from the car by a sudden jerk, and a nonsuit had been granted, we would have sustained it under the ruling in the case of the *Central R. R. & Banking Co.* v. *Sims*, 80 *Ga.* 749. There it was held that, "Where a gravel or repair train is

managed as usual, and the jerk complained of is only such as would be expected to occur on a train of that character in doing its work, the employees engaged on it or attached to it take the risk as incidental to the service, and if injured by the jerk, cannot recover of the company." The facts in this case are different from the facts in that case. There the only negligence on the part of the company complained of was, that the train "slackened up a little, and plaintiff started to step across from the car he was on to the car the chest was on, reaching out to catch hold of the chest to assist him in getting over; and just then the engine gave the train a big jerk, throwing plaintiff between the cars and knocking him to one side of the track." This we held to be a risk incident to the service in which the employee was engaged. In the present case, the plaintiff testified that it was his duty to give the signal to the engineer not to stop at the station which the train was approaching; that he gave the signal, and that the rules of the company required the engineer to answer the signal; that the engineer failed to answer it, and he continued to give the signal; and that the engineer, without answering it, turned on steam and thereby caused a sudden and unusual jerk, which threw the plaintiff out of the car. If it was the rule of the company that the engineer should answer the signal, the plaintiff had a right to rely upon his doing so before taking precautions to guard himself against the jerk which he knew would be produced by the engineer's turning on steam. If the engineer had answered the signal, it is probable that the plaintiff would have ceased giving the signal and returned to his seat before steam was put on, and thereby saved himself from the injury which he received. Taking all the facts together, we think the plaintiff ought to have been allowed to go to the jury thereon.

2. There was no error in refusing to allow the plain-

tiff to answer the question set out in the first ground of the motion for a new trial. It is claimed by counsel for the plaintiff that, it having been shown that the plaintiff was an expert in such matters, he should have been permitted to answer it. Whether he was an expert or not, we do not think he ought to have been allowed to give his opinion upon the propriety of his own conduct on that occasion. We do not think that even an expert, who is a party, should be allowed to do that, on such a question.

3. We make no ruling on the point whether a motion for a new trial can be made in a case where a nonsuit has been awarded, as counsel for the defendant in error did not insist upon it. We can only say that we do not approve the practice. A motion to reinstate the case, or a bill of exceptions to this court, is the better practice.

*Judgment reversed.*